## YOUNG *v.* UNION INS. CO.

*(District Court, N. D. Illinois. June 15, 1885.)*

1. MARINE INSURANCE—INSURABLE INTEREST—TRUST.

When the legal title to a vessel is wholly in a party as trustee, he may insure her for the use of his beneficiary.

2. SAME—RIGHT TO ABANDON—LOSS IN EXCESS OF HALF AMOUNT INSURED—STRANDED VESSEL—ADDING EXPENSE OF REPAIRS AND COST OF GETTING VESSEL AFLOAT.

When a vessel has stranded, the insured may add the cost of repairs to the cost of getting her off the beach, and getting her to a port of safety and repair, for the purpose of making such an amount as to equal or exceed half the amount insured.

3. SAME—DELAY OF INSURED IN GIVING NOTICE OF ABANDONMENT.

When the delay of the insured in giving notice of abandonment has not prejudiced the insurer, such delay will not impair or affect the rights of the insured.

4. SAME—"SUE AND LABOR" CLAUSE IN POLICY—UNDERWRITER TAKING POSSESSION—CONSTRUCTION—TOTAL LOSS.

Where the underwriter takes possession of insured property under the "sue and labor" clause in a policy, for the purpose of saving, and, if necessary, repairing the property, he must make reparation and return within a reasonable time, or he makes the property his own, and is liable for a total loss.

In Admiralty.

*W. L. Mitchell* and *G. D. Van Dyke,* for libelant.

*Schuyler & Kremer,* for respondent.

BLODGETT, J. In this case, libelant seeks to hold respondent for a constructive total loss upon a policy, by which respondent insured to libelant a half-interest in the schooner H. D. Moore, her tackle, apparel, and furniture, for the sum of $2,500, against the perils of navigation upon the lakes, rivers, etc., from the first day of April, 1883, to the thirtieth day of November of that year; loss payable to libelant or to his order. The defenses set up are: (1) That libelant had no insurable interest in the schooner, but that he held the legal title as naked trustee for one James T. Young; (2) that, under the facts in the case, and the terms of the contract of insurance, the libelant was not entitled to abandon the schooner as for a constructive total loss; and respondent is not liable on said policy for such loss.

There is little, if any, conflict in the testimony as to the material facts of the case. It is undisputed that, in March, 1880, James T. Young and one James McMullen purchased the schooner in question from H. D. Moore, each paying one-half the price; that said James T. Young directed that his interest in the purchase should be conveyed to the libelant, and accordingly a bill of sale in due form was executed and delivered by Moore to libelant, and the said McMullen, conveying to each of them an undivided half of said schooner, with her boats, tackle, etc.; that the said James T. Young, from the time of said purchase up to the time of the loss now in question, resided in Chicago, and acted as the manager and ship's husband of said schooner, and had the benefit of the earnings of the half interest standing in the name of libelant; that, at the time the policy now in question was taken out, the agents of respondent were fully informed of the fact that the beneficial ownership was in the said James T. Young, and issued said policy with the knowledge and understanding that libelaht was acting as trustee for said James T. Young, and insuring his interest.

It also appears that on November 13, 1883, and while the policy was in full force, the schooner was stranded in a gale of wind upon the east shore of Lake Michigan near Kilderhouse Pier; that the captain of schooner telegraphed to the said James T. Young the fact that the schooner was so stranded, and said Young promptly communicated his information to Messrs. Keith & Carr, the agents of respondent in Chicago, and also informed them that the services of a tug and steam-pump would be necessary to get her off. On receiving this information Keith & Carr requested Young to telegraph to Manistee and ascertain if a tug could be obtained there, and at what price. Young sent a telegram to Manistee as requested, and received answer that a tug and steam-pump could be had for $185 per day. Keith & Carr then engaged the tug and pump, and sent Capt. Blackburn, their own wrecking-master, by rail to meet the tug, and take charge of the work of getting the schooner off. The schooner was got afloat by the aid of the tug and pump on the twenty-first of November, but, while at work upon the Moore, the wrecking-master received instructions from Keith & Carr, respondent's agents, to take the schooner to Northport, about 40 miles from the place where she had been stranded, and then to take the tug to the assistance of another schooner, the Watertown, that had been stranded near Northport.

The wrecking-master followed these instructions, and towed the Moore to Northport, which was not a port where she could be repaired, and then went to the relief of the Watertown. Having succeeded in getting the Watertown afloat and towing her also to Northport, Capt. Blackburn, on the seventh of November, attempted to tow the two disabled vessels to Chicago with the tug he had used in getting them afloat; but the weather became so tempestuous that he was obliged to return to Northport, where he laid the Moore up for the winter,

having employed her captain to remain on board of her as ship-keeper. The proof also shows that the captain of the Moore objected to being taken to Northport, and insisted that he should be towed to a port of repair, or be allowed to sail to Chicago, which he testifies he thinks he could have done with safety; but Blackburn, the wrecking-master, told the captain that his orders were to take the schooner to Northport; and he did so against the objections of the captain.

In the latter part of February, the libelant was informed that the charges for the services of the tug and steam-pump had not been paid, and that a libel of the schooner for such services was threatened, and was also informed that the schooner was in danger of being damaged by pounding against the pier or dock along which she was moored in Northport harbor, and on the seventh of March, 1884, notice of abandonment as for a total loss was duly served on the proper agents of respondent, and in apt time thereafter proofs of loss and bill of sale to respondent in due form of all libelant's interest in said schooner, with the consent and by direction of said James T. Young, were duly delivered, or tendered, to the proper agents of respondent, but respondents refused to accept said abandonment. It also appears that, in the latter part of April, the schooner was, by the direction of the agents of respondent, towed from Northport to the port of Chicago, where she arrived on April 30th. Soon after her arrival here, an *ex parte* survey was made at the instance of the respondent's agents as to the amount of repairs needed to restore the schooner to the condition she was in before the disaster. And after such survey the schooner was taken to a dry-dock here by orders of the agents of respondent, but, owing to some misunderstanding with the proprietors of the dock as to who was to pay for the needed repairs, she was run out of the dock and remained in the river until about May 24th, when she was again, by the direction of respondent's agents, taken into the dock and repaired in substantial accordance with the survey; and on the eleventh of June she was tendered to the libelant as fully restored to her condition prior to the disaster. The libelant refused to receive her for two reasons (1) Because he insisted upon his right of abandonment, and to be paid as for a total loss; and (2) because she was not so fully and completely repaired as to restore her to the same serviceable condition she was in before the disaster.

It further appears that respondent paid the captain for his services as ship-keeper from the time the schooner was laid up in Northport until she was put into dry-dock, and also paid the wages of seamen employed to assist in navigating the schooner from Northport to Chicago. It also appears that the expense incurred in getting the schooner off the beach and towing her to Northport, and from Northport to Chicago, and the wages of the ship-keeper until she went into dry-dock for repairs, and the wages of the seamen on the trip from Northport to Chicago amounted to $2,463.93, and that the expenses for the repairs amounted to $2,483.37. It is also conceded that at the

time of the issue of the policy in question, another policy was issued by the Insurance Company of the State of Pennsylvania for the same amount, on the half interest of McMullen, co-owner of the schooner with libelant, and that the whole value of the schooner was fixed by the terms of each policy at $6,500, thus making the owners insurers for $750 each. And also that the same agents, Keith & Carr, represented the insurers in both policies. The proof also shows that at the time the schooner was tendered to the libelant, on June 2d, there were no sails or running rigging upon her, and her anchor was a second-hand one and much lighter than her old anchor, which was lost at the time of the disaster, that her center-board would not work in the box, and that her yawl or small-boat had been lost in the disaster and had not been replaced. It further appears that on August 30, 1884, the schooner was again tendered to libelant by respondent, but that while another anchor of substantially the weight and usefulness of the one lost had been placed on board of her, she still had no running rigging, nor sails, nor yawl-boat.

The policy in question contains the following clauses, which it becomes material to consider in the light of the facts in the proof:

"It is agreed that the acts of the insured, or insurer, or its agent, in recovering, saving, and preserving property insured in case of disaster shall not be considered a waiver, or an acceptance of an abandonment, nor as affirming or denying any liability under this policy; but said act shall be considered as done for the benefit of all concerned, and without prejudice to the right of either party.

"Further, the insured shall not have a right to abandon the vessel in any case, unless the amount which the insurer would be liable to pay under an adjustment as of a partial loss shall exceed half the amount insured."

As to the first point made by the defense, I understood at the time of the argument that it was substantially abandoned, as the proof showed without dispute that the insurers were fully advised, at the time this policy was taken out, of the nature of the libelant's interest, and that he intended by such policy to insure the half interest standing in his name, for the benefit of his brother, James T. Young. Whether said point was abandoned or not, I am well satisfied that it is not well taken, as the authorities all seem to concur in the proposition that the legal title being wholly in libelant as trustee, he had the right to insure the property so held by him for the use of his beneficiary. As to the second point made by the defense, the contention is that the insured cannot add the cost of repairs to the cost of getting the schooner off the beach, and getting her to a port of safety and repairs, for the purpose of making such an amount as to equal or exceed half the amount insured.

Without going into a discussion of the somewhat technical learning on the subject of the right of abandonment, either at common law or under the old forms of policy, or under what is known as the "Boston clause," it is sufficient to say that it seems to me the only question to be considered for the purpose of settling the right of aban-

donment under the 50 per cent. clause in this policy is the amount of damage which the owner of the insured property received by reason of the disaster sustained by the schooner; and there can be no doubt from the proof that the damages by reason of the disaster in question consisted, first, in the expense of getting the schooner afloat, and getting her to a port of safety and repair, including the care and keeping of the schooner in the interval between the time she was got afloat and the time she reached a port of repair, and the cost of repairing her, so as to put her in as good a condition as she was before the disaster; and the proof abundantly shows that, after deducting from the cost of the repairs one-third new for old, and charging to the owner's interest his portion of the salvage expenses, the amount of the salvage expenses and the repairs would equal one-half of the amount insured.

It is argued that the owner should have exercised his right of abandonment at once when he learned of the disaster to the schooner, and that the insurers having, under what is known as the "sue and labor" clause of this policy, simply taken measures to get the vessel afloat and get her to a place of safety and repair, these expenses are to be adjusted as against all interests by a general average, and only the repairs are to be adjusted upon the basis of a partial loss, or particular average; but such course seems to be neither called for by the spirit or letter of this contract of insurance. The purpose and intent of the policy was to make the insured whole for any damage the schooner might receive from any of the perils insured against, and if such damage exceeded 50 per cent. of the amount insured, then the right of abandonment is given; and there can be no dispute but what the expense of getting the vessel off and of the necessary repairs, after making all deductions called for by the policy, more than equals 50 per cent. of the amount insured. I think the conclusion I have arrived at is fully supported by the opinion of Mr. Justice MATTHEWS in *Wallace* v. *Thames & M. Ins. Co.* 22 FED. REP. 66.

It is further urged that the insured is chargeable with unreasonable delay in giving his notice of abandonment,—the disaster to the schooner having occurred in November, and the notice of abandonment not having been given until the seventh of March following; but I do not see, under the peculiar facts in this case, how this delay can have worked any injury to the insurer, and if it did not it seems to me it should not in any way impair or affect the rights of the insured in the premises. If the agents of respondent had taken the schooner at once, upon getting her afloat, to a port where she could have been repaired, and where a survey could have been made to determine the cost of such repairs, it might have been the duty of the insured to have exercised his right of abandonment at an earlier time or as soon as an intelligent survey could be made, and the amount of damage by the disaster ascertained; but, inasmuch as the schooner in this case was detained at Northport by the act of the respondent,

and against the protest and objection of her master, acting as agent for the owners, so that the insured could not intelligently and fully ascertain the extent of the damage, and the probable cost of repairs, so as to determine the full extent of the damage by reason of the disaster; and inasmuch as, at the time the notice of abandonment was given, there was still ample time for the respondent to have repaired the schooner, or sold her without repair for the next season's business,—it seems to me it does not lie in the insurer's mouth to object to the delay. It certainly was not the fault of the owner of this schooner that she was kept from a port of repair and out of the possession of her own owner.

What are called "salvage" expenses and the "repair" expenses, when added together, make more than 50 per cent. of the amount insured, and this fact seems to me to give the insured the right of abandonment, unless he has lost it by unreasonable delay; and as I do not see that the delay under the circumstances was unreasonable, it appears to me that the right of abandonment was not lost or waived. It also seems quite clear to me that the underwriters have dealt with this property since the disaster in such manner as to make it their own. From the time the wrecking tug took hold of the schooner to get her off the beach up to the time she was tendered to the libelant and his co-owner on the eleventh of June, 1884, she was continuously in the possession and control of the insurance companies; and when she was tendered, on the eleventh of June, she had not been so repaired as to restore her to the condition in which she was immediately prior to the disaster. The right to repair and return the insured property after disaster implied of itself the obligation to return her in as good condition as she was in before the stranding; and yet the proof shows that no sails or running rigging were tendered with her, nor was her anchor or yawl-boat replaced, as they should have been. After the refusal of the libelant to accept the schooner, instead of promptly completing the reparation, respondent retained the schooner, without any apparent excuse, until more than half the season of navigation for that year had gone by, and then made another tender while she was still in an incomplete condition. I think there can be no doubt of the general proposition that where underwriters take possession of insured property under the "sue and labor" clause for the purpose of saving, and, if necessary, repairing the property, they must make reparation and return within a reasonable time, or they make the property their own, and are liable as for a total loss; and, it seems to me, the case is therefore brought clearly, by the facts, within the operation of this principle, and that the insurance companies could not keep this property in their own control for nine months after the disaster and then compel the owners to take it back, especially in an incomplete condition.

It was urged that the sails and running rigging of this schooner were stored in a sail loft, and where the owner could readily have

obtained them without expense for the purpose of putting them in place; but it was the duty of the insurers, who had assumed the task of restoring this vessel to her original condition, to have put her in complete sailing trim before they could compel the owners to accept her from their hands. They were not obliged to seek the sails and rigging where they had been stowed and take the expense or delay of putting them in place, but had the right to insist that this should be done by the insurers as part of the repairs. I am therefore of the opinion that the libelant makes out by the proof in this case a clear right of recovery as for a constructive total loss; and the finding will therefore be for the amount of the policy, with interest after 60 days from the time proofs of loss were served.